Filed 9/6/16  P. v. Martinez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C079469 |
| Plaintiff and Respondent, | (Super. Ct. No. SF123594A) |
| v. | |
| JOSE MARTINEZ, | |
| Defendant and Appellant. | |

On April 6, 2013, two males were seen climbing out the kitchen window of a residence in Stockton by neighbors who heard suspicious noises next door in their duplex.  A short time later, police apprehended defendant and a minor, whose clothing, size, and stature matched those of the individuals seen leaving the residence.  The minor was called as a prosecution witness and his testimony combined with prior statements to the police inculpated defendant.

1

Defendant was convicted of first degree residential burglary.  (Pen. Code, §§ 459, 460, subd. (a).)[1]  The trial court sentenced defendant to the upper term of six years imprisonment.

On appeal, defendant asserts that a showup identification procedure conducted by police on the night of the burglary, in which defendant was identified as one of the perpetrators, was unduly suggestive, lacked sufficient indicia of reliability, and was prejudicial.  He further contends that showup identification procedures should be abolished in California.  Defendant also asserts that he should have received additional days of custody and conduct credits, and that the abstract of judgment and a minute order must be corrected to reflect the statutory basis of a surcharge imposed on the restitution fine.

We conclude that defendant forfeited his contentions concerning the purported showup identification procedure, and that, in any event, what the police did was not unduly suggestive.  We also decline defendant's request that we abolish showup procedures in California.  We agree with defendant that the abstract of judgment and minute order must be corrected to reflect the correct number of presentence days of custody and conduct credits to which defendant is entitled, and to state the statutory basis for a $30 surcharge imposed.  We otherwise affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

By information, defendant was charged with first degree residential burglary (§§ 459, 460, subd. (a)).

### The People's Case-in-Chief

Suger Ortiz and her daughter, Katia Ortiz, lived in a duplex on Volney Street in Stockton.[2]  Their residence shared an interior wall with their neighbors, Alicia Toscano

---

[1]  Further undesignated statutory references are to the Penal Code in effect at the time of the charged offense.

and her younger sister, Jennifer Gerolaga. On the morning of April 6, 2013, Suger and Katia left home to attend a quinceañera.

At approximately 9:30 p.m., Gerolaga heard "moving around and . . . stuff dropping" in the adjacent Ortiz apartment. Gerolaga brought this to Toscano's attention. Toscano and Gerolaga knew that Suger and Katia were attending the quinceañera. They both went to the living room to listen to the noises coming from the Ortiz residence. Toscano heard a ruckus. She called 911 while Gerolaga went to the back door to see if she could see anyone. Toscano also went to the back door, and, at that point, Toscano and Gerolaga both saw two individuals jump out of the Ortizes' kitchen window. The individuals were wearing dark hooded sweatshirts, jeans, and tennis shoes. Neither Toscano nor Gerolaga were able to see the faces of the two intruders.

A recording of Toscano's 911 call was played for the jury. She reported hearing "banging . . . like, going through the drawers" coming from the Ortiz residence. Later, Toscano told the 911 operator that at least one of the intruders had left. Toscano informed the operator, apparently based on information supplied by Gerolaga, that one individual seen leaving was wearing a gray hoodie. When asked whether she thought there was still someone in the Ortiz house, Toscano responded that she thought "there was two of 'em." Toscano then reported that Gerolaga had indicated that there were three intruders. They had jumped out of the kitchen window and run. Toscano stated that one of them was wearing a black hooded sweatshirt with red writing on it, and another had a gray hoodie on.

At trial, Toscano clarified that she personally only observed two individuals leaving the Ortiz house. She saw one individual wearing a gray hoodie, and a second individual wearing a black or blue hoodie. Toscano testified at trial that there "was

---

**2** Because Suger Ortiz and Katia Ortiz share the same last name, we refer to them by their first names.

nothing on the hoodies." The individuals ran southbound towards 12th Street. Toscano said police officers arrived at her house approximately five to seven minutes after she called 911 and took a statement from her.

Officer Ralph Dominguez arrived in the vicinity of the Ortiz home on Volney Street at approximately 9:36 p.m. Based on the information transmitted over the radio, Dominguez went to a location on Arriba Street to see if he could locate the individuals who had been seen leaving the house and "cut them off at the pass." Dominguez saw two males walking a few units down from the location of the call. Dominguez was about 50 yards away. The individuals were walking away from Dominguez, so he was unable to see their faces. One of the individuals was wearing a black hoodie, and the other was wearing a gray hoodie. Dominguez shined his spotlight on the individuals, and they immediately began running south. Dominguez briefly pursued the individuals in his patrol vehicle, and then parked the car and ran after them. He identified himself as a Stockton police officer and ordered the individuals to stop, but they did not. The two individuals split up. Dominguez lost sight of the individual wearing the gray hoodie as he continued to chase the individual in the black hoodie. Eventually, the person with the black hoodie climbed over several fences, and Dominguez gave up his pursuit. Dominguez broadcast over the radio where he had last seen the subject. As Dominguez backtracked along the route of his pursuit, near where he had begun the chase, he discovered a number of items spread out on the grass, including a pillowcase, pill bottles, a purse, jewelry, a red 49ers hat, shoes, and socks. Katia's name appeared on the pill bottles. Dominguez collected the items and later turned them over to Officer Morin. Viewing defendant in court, Dominguez testified that defendant's build was similar to that of one of the individuals he chased that evening.

Officer Nathan Hance arrived in the area approximately three minutes after receiving the radio broadcast. Hance heard Dominguez state over the radio that several subjects were running from him. As Hance continued driving down the street, he

4

observed a subject wearing a black sweatshirt and blue jeans running southbound. Hance exited his patrol vehicle and chased the individual. The subject jumped over several fences, and, eventually, Hance lost sight of him. Hance was unable to see the person's face. However, viewing defendant in court, Hance testified that the person with the black sweatshirt he chased was similar to defendant in height, weight, and build, although he could not say whether his skin tone was similar because it was dark.

Officers Jamie Morin and his partner, Officer Cox, were dispatched to a location on Volney Street. After they and other officers were unable to locate any suspects within an established perimeter, Morin spoke with Toscano and Gerolaga. Gerolaga told Morin that she saw two males exit the window, one wearing a black hooded sweatshirt and the other wearing a gray hooded sweatshirt. She indicated that the gray sweatshirt had red writing on it. Gerolaga also told Morin that one of the individuals was carrying a Food-4-Less bag and a pillowcase, both of which appeared to contain items.

Investigating the Ortiz residence, Morin observed that the home had been ransacked, with drawers pulled out and clothing on the floor. The kitchen window had a hole in it, and there was broken glass on a table and on the floor. Morin looked out the kitchen window and observed two individuals matching the descriptions given by Toscano. The individuals were about 40 to 50 feet from the Ortiz home, running north away from the residence towards 10th Street. One of the individuals was shorter than the other. Viewing defendant in court, Morin testified that defendant matched the height and build of one of the individuals he saw.

Morin exited the Ortiz residence and he and his partner drove northbound on Volney Street in their patrol vehicle. The individuals continued to run north, and Morin and his partner kept track of them as they ran between apartment buildings. Morin turned left onto 10th Street, and saw the individuals leaning over next to a residence. When Morin shined a spotlight on the individuals, they ran south. Morin and his partner continued to pursue the individuals. Morin stopped his vehicle mid-block, and he and his

5

partner ran after the individuals. The individuals appeared to be winded; they slowed down and ultimately stopped. Morin and his partner pointed their service weapons at the individuals and ordered them to the ground. One of these individuals was defendant, and the other was R.G., a minor. Once they were on the ground, Morin noticed a Food-4-Less bag approximately two feet from defendant.[3] Defendant was wearing a black hoodie and R.G. was wearing a gray hoodie.

Approximately 15 minutes after they initially contacted Toscano, police officers returned and asked her if she would be able to identify the individuals she had seen. According to her trial testimony, Toscano told the officers she could not because she had only seen their backs and had not seen their faces. The officers nonetheless asked Toscano to walk down to where the individuals were detained and look at them. She did not go. However, from her porch, Toscano had already seen police officers escorting a person towards a police car after they caught him down the street. She explained that she did not see the officers catch the individual, but did see him as they were walking him toward a police car. Toscano testified that "he was wearing the same thing that the person that jumped out, he was wearing the same thing, the same colors." He was also the approximate height and build of the person she saw. Based on these circumstances, Toscano testified that she thought he was the same person. She said that she was not sure, "but he was wearing the exact same thing that the person that jumped out of the window was wearing." Toscano testified that she only saw one detained individual.

Morin testified that when he spoke with Toscano after the suspects were detained, she did not want to go out and view them. However, she told Morin that she had already seen the suspects who had been detained when they walked in front of the patrol vehicle's headlights, and she said "they were definitely them," referring to the individuals

---

[3] On cross-examination, Morin acknowledged that he never saw the Food-4-Less bag in anyone's hand, and that the first time he observed it was when he saw it on the ground.

6

she had seen coming out of the Ortiz house. Toscano did not mention anything about the faces of the suspects, but she told Morin that she had seen them in the neighborhood frequently. According to Morin, Toscano stated that she was "positive that they were the ones running from the house."

Gerolaga testified that the police asked her to see if she could identify someone they had apprehended, but she did not cooperate. She testified, "I didn't want to be involved in nothing." However, she told police that one of the two individuals they had detained was wearing the same clothes as one of the individuals who jumped out of the Ortizes' window. When asked what was going on that caused her to look to see who they had in custody, Gerolaga testified, "It was just all kinds of chaos, all kinds of police." According to Gerolaga, police had detained a short individual and a tall individual. She informed police that the short individual was one of the people who had jumped out the window. However, she testified she "didn't exactly tell the police that that was the guy. [She] told the police that that -- they were both short, so maybe it's a possibility that that was him." On cross-examination, she testified that the taller person was not one of the people who she saw coming out of the house. In a May 2014 interview with a police burglary detective who was doing follow-up investigation, Gerolaga stated that she had seen two individuals jump out the window next door, and that the two males arrested by police that night were the two individuals she saw jump out the window.

At the time Toscano and Gerolaga viewed defendant and R.G., those suspects were approximately 100 feet from Toscano and Gerolaga's location.

R.G. testified for the prosecution.[4] R.G. had admitted an allegation of resisting arrest in juvenile court based on this incident, and stated that the burglary allegation had been dismissed. However, R.G. said he was not offered a deal for his testimony.

---

[4] R.G. did not appear pursuant to a subpoena, and the trial court issued a material witness warrant for his arrest.

7

R.G. said that he and defendant and two other individuals who were minors were going to a party when they decided to break into a house on Volney Street. They could tell no one was in the house. One of the minors broke a kitchen window with a crowbar to gain entry. At approximately this point in the testimony, R.G. said he no longer wished to testify. The trial court ordered him to testify. He testified that he did not want to be in court. Thereafter, when asked whether defendant was in the house with him, R.G. said defendant was not and also denied having told the police defendant was inside the residence. On cross-examination, R.G. again stated defendant did not enter the house. He claimed he ran into defendant after he and the other two minors had broken into the house. However, on redirect and subsequent recross examination, R.G. testified that all four individuals went into the house, including defendant. Later on recross-examination, R.G. again said defendant did not go inside the house. R.G. also denied that he or his confederates took anything from the house, but testified at other times as to items that he and the others took.

On cross-examination, R.G. testified that he had told his parents that he lied about defendant being with him on the night of the break-in at the Ortiz home. He also testified on cross-examination that, after he was arrested and placed in a patrol vehicle, after being left alone for approximately 10 minutes, an officer read him his rights and then told him: "we caught you and [defendant] committing a burglary." R.G. stated that he "just went along with it because [he] [was] scared." However, R.G. testified that this was not the truth. R.G. said the other minor who went into the house with him took all of the stolen property, except R.G. took a watch. R.G. testified he did not remember the names of the other two minors who participated in the burglary.

Officer Morin testified that he interviewed R.G. when he arrested him. Morin testified that he did not tell R.G. that he had committed burglary; he did not accuse R.G. Rather, Morin asked R.G. why he had run away, and R.G. responded that he had a pending case and he did not want to get caught. Morin replied, " 'What were you going

8

to get caught about?  We are investigating an incident tonight that happened.  Do you know anything about it?' "  R.G. replied that he had met up with defendant and two other individuals, and they had planned to go to a party.  On their way to the party, R.G. told the other three individuals that he knew of a house that was empty, and he wanted to go inside and get some money and jewelry.  According to R.G., they went to the rear of the house and one of the unidentified individuals broke a window with a crowbar, and they all entered the residence.  However, it soon " 'went bad' " when the police arrived.

Morin also interviewed defendant on the night of his arrest.  Defendant told Morin that he and R.G. had met up and they were going to a party when the police came upon them.  He said he had not done anything wrong.

### Defendant's Case

Officer Chris Pulliam testified he went to R.G.'s house because R.G.'s parents called police expressing concern for their son.  R.G. told Pulliam that he was nervous about what was going on in court.  R.G. said he was "a little bit in fear that somebody [was] going to come after him."  Pulliam asked R.G. if he had received any threats, and R.G. stated that he had not.  He was "just kind of afraid that they are going to start coming in the future."  He stated that he was worried about defendant's friends.

R.G. also stated that he lied about everything and he lied about what he said in court the previous day.  When Pulliam asked R.G. if he lied to the police when he first spoke with them, R.G. responded that "he lied the first time and he just stuck with it the whole time."

Pulliam testified about what R.G. had said happened the night of the burglary. "He said that they were walking around in the Sierra Vista neighborhood, he was a juvenile at the time, and on probation.  So he noticed a -- some police officers coming towards him.  And I -- he thought that the police officers were gonna stop them, so he said they just started running because he was on probation when they were caught a short time later.  And then after they were caught, the officers were questioning them about a

9

burglary that occurred in the neighborhood, which he says that they had nothing to do with.  [R.G.] being a juvenile and on probation, decided he would tell the officers that he was involved in the burglary, thinking that it would take all of the pressure off of the other person that he was with, thinking that being a juvenile, he'd catch all the punishments and stuff and it wouldn't be a big deal because he's a juvenile.  And since things didn't go the way he had planned, now he's in fear because he's basically saying everything he's been saying is a lie and he doesn't want to get threats or anything due to that."[5]

### Verdict and Sentence

The jury returned its verdict, finding defendant guilty of first degree residential burglary. (§§ 459, 460, subd. (a).)  Later, the trial court sentenced defendant to the upper term of six years imprisonment.

### DISCUSSION

### I.    Purported Showup Identification Procedure

### A.  Defendant's Contentions

Defendant asserts that the purported showup identification procedure, and the resulting in-court identification of him, violated his due process rights.  He asserts that showup procedures should be abolished in California.  He further asserts that the procedure in this case was unduly suggestive, and that it lacked sufficient indicia of reliability.  Defendant asserts that he suffered prejudice as a result of the introduction of evidence relating to the showup procedure.  Finally, defendant asserts that, in the event that he has forfeited the issue by failing to raise it in the trial court, he was denied the constitutionally effective assistance of counsel.

---

[5]  Thereafter, called as a witness by the People, Pulliam acknowledged that what R.G. told him, in effect, was that he had "decided to say he committed a crime to take the fall for everyone even though nobody did anything."

10

As defendant acknowledges, his trial attorney did not object to the identification. Therefore, defendant has forfeited his contentions that any showup procedure was unduly suggestive, lacked sufficient indicia of reliability, and was prejudicial. (Evid. Code, § 353; *People v. Cunningham* (2001) 25 Cal.4th 926, 989 (*Cunningham*) [failure to timely assert objection to photographic identification evidence results in waiver of the issue].)

Notwithstanding the forfeiture, we address the merits of defendant's contentions to dispose of defendant's assertion that his trial attorney's failure to object to this evidence constituted ineffective assistance of counsel.

### B. Analysis

We first address defendant's contention that showup procedures should be abolished in California. As defendant acknowledges, our high court has concluded that " '[t]he "single person showup" is not inherently unfair.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 413 (*Ochoa*), quoting *People v. Floyd* (1970) 1 Cal.3d 694, 714, disapproved on other grounds in *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36.) Even if we were inclined to agree with defendant that "the rationale of the seminal California case on show-up identifications is flawed," and that such procedures should be abolished in California, which we are not, our high court has spoken on the matter, and we are bound by its precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Turning to the merits of defendant's contentions, "[i]n order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the

11

suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*Cunningham, supra*, 25 Cal.4th at p. 989.) "Whether an identification procedure is suggestive depends upon the procedure used as well as the circumstances in which the identification takes place." (*People v. Nguyen* (1994) 23 Cal.App.4th 32, 38.) "[F]or a witness identification procedure to violate the due process clauses, the state must, at the threshold, improperly suggest something to the witness—i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure. . . . 'A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police.' " (*Ochoa, supra*, 19 Cal.4th at p. 413.) "A due process violation occurs only if the identification procedure is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " (*People v. Cook* (2007) 40 Cal.4th 1334, 1355, quoting *Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253] (*Simmons*).)

A claim that a pretrial identification procedure was unduly suggestive is subject to our independent review. (*People v. Kennedy* (2005) 36 Cal.4th 595, 609, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.) The burden of demonstrating an identification procedure violates due process is on the defendant. (*Cunningham, supra*, 25 Cal.4th at pp. 989-990.) If the defendant fails to meet his or her initial burden of demonstrating that the identification procedure was unduly suggestive, we "need not reach the question ' "whether the identification was nevertheless reliable under the totality of circumstances." ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1164 (*Carter*); *Ochoa, supra*, 19 Cal.4th at p. 412.)

We conclude that defendant failed to establish that any identification procedure employed by law enforcement here was unduly suggestive. Indeed, the evidence does not establish that the police even conducted a showup here. To the contrary, the evidence shows that the two witnesses refused to walk down the street to view the suspects.

However, prior to being asked to do so, the two witnesses saw the suspects in custody and told the officers about that. Thus, the evidence does not establish that the police employed any identification procedure here.

Moreover, even if what happened here could be considered a showup identification, as we have noted, it is well established that " '[t]he "single person showup" is not inherently unfair.' " (*Ochoa, supra*, 19 Cal.4th at p. 413.)

Police asked Toscano to view the show-up approximately 15 minutes after her initial contact with law enforcement.[6] She had already seen one or both suspects being escorted to a patrol vehicle by that time. Thus, the identification took place only minutes after Toscano and Gerolaga saw the individuals exiting the Ortiz home. The identification also occurred in close geographic proximity to where Toscano and Gerolaga saw the perpetrators exiting the Ortiz home. When Toscano and Gerolaga viewed the two individuals that police had apprehended, those individuals were approximately 100 feet from Toscano and Gerolaga's location in their home. The "law favors field identification measures when in close proximity in time and place to the scene of the crime, with the rationale for the rule being stated: 'The potential unfairness in such suggestiveness . . . is offset by the likelihood that a prompt identification within a short time after the commission of the crime will be more accurate than a belated identification days or weeks later.' " (*In re Richard W.* (1979) 91 Cal.App.3d 960, 970.)

---

[6] Although defendant noted that, on this record, "no officer testified that they read [Toscano] any type of admonition regarding the show-up," defendant does not contend that the pretrial identification procedures were tainted on the ground that there is no indication that the witnesses were given an admonition pursuant to *Simmons, supra*, 390 U.S. 377. Indeed, it appears no *Simmons* admonition was given because both witnesses refused to participate in an identification procedure and no identification procedure was conducted. Moreover, we note that nothing in *Simmons* explicitly requires that an admonition be given in any event. Rather, an admonition is merely a tool to help negate suggestiveness and assure the reliability of an identification.

"Prompt identification of a suspect who has been apprehended close to the time and place of the offense 'aids in quickly exonerating the innocent and discovering the guilty.' " (*People v. Irvin* (1968) 264 Cal.App.2d 747, 759.) "One of the justifications for a showup is the need to exclude from consideration innocent persons so that the police may continue the search for the suspect while it is reasonably likely he is still in the area." (*People v. Johnson* (1989) 210 Cal.App.3d 316, 323.) Here, the pretrial identification was "in close proximity in time and place to the scene of the crime . . . ." (*In re Richard W.*, at p. 970.)

Moreover, some details defendant asserts to be unduly suggestive are inherent in many showups. Specifically, defendant argues that the procedure was unduly suggestive because he "was in the presence of uniformed officers and paraded in front of a squad car." However, a showup "is generally an informal confrontation involving only the police, the victim and the suspect." (*People v. Rodriguez* (1987) 196 Cal.App.3d 1041, 1049.) The necessity of patrol cars under the circumstances was inherent in the type of crime that occurred and the possibility that the individuals being detained were perpetrators. Given the very nature of showup procedures and the circumstances here, it cannot reasonably be maintained that the presence of police and their vehicles rendered the showup unduly suggestive.

Defendant seemingly complains that he and R.G. were wearing clothing matching the clothing worn by the perpetrators, as described by Toscano and Gerolaga, and that this was a factor making the purported showup unduly suggestive. Toscano and Gerolaga described the perpetrators' appearance and clothing before the showup procedure. The mere fact that, 15 minutes after the burglary, the individuals detained were wearing clothing that matched the clothing worn by the perpetrators did not constitute any conduct on the part of the state, wittingly or unwittingly, to suggest something to the witnesses. (See *Ochoa, supra*, 19 Cal.4th at p. 413.) Thus, this did not give rise to an unduly suggestive procedure.

14

Toscano and Gerolaga both had a good opportunity to view defendant and his associate at the time of the offenses, as they were exiting the Ortizes' kitchen window. According to Morin, when he spoke with Toscano after defendant and R.G. were detained, she did not want to go out and view the suspects. However, Toscano told Morin that she saw the suspects who had been detained when they walked in front of a patrol vehicle's headlights, and she said "they were definitely them," referring to the individuals she had seen coming out of the Ortiz house. Furthermore, Toscano had seen these same individuals in the neighborhood frequently. Thus, there was an independent source for her identification. According to Morin, Toscano stated that "she was positive that they were the ones running from the house."

In the follow-up interview with police, Gerolaga stated that she had seen two individuals jump out the window next door, and that the two males arrested by police that night were the two individuals she saw jump out the window.

When Morin first saw the suspects from inside of the Ortiz home, he observed that they matched the description he had received earlier from Toscano. Morin testified at trial that defendant matched the height and build of one of the individuals he saw at that time. On this record, no part of the conversation between Morin and the witnesses, as reported by each of them, indicates that Morin was suggestive in his communications with them before or after they saw the individuals who had been detained. We conclude that nothing in these circumstances gives rise to the conclusion that the state improperly suggested something to the witnesses, or that, wittingly or unwittingly, the state conducted an unduly suggestive procedure. (*Ochoa, supra*, 19 Cal.4th at p. 413.)

Defendant had the burden of "showing unfairness as a demonstrable reality, not just speculation." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.) Defendant has failed to show that there was a showup here, or if there was one, that it was unduly suggestive. Having failed to meet the first criterion of demonstrating that any identification procedure employed by the police was unduly suggestive, we need not

15

proceed to consider the factors showing that the identification was nevertheless reliable under the totality of the circumstances. (See *Carter, supra*, 36 Cal.4th at p. 1164; *Ochoa, supra*, 19 Cal.4th at p. 412.)

Defendant has not demonstrated that his attorney's failure to object to the identification evidence amounted to constitutionally ineffective assistance of counsel. It seems clear counsel did not object because there was no identification procedure orchestrated by the police.[7] Moreover, any challenge to the identification evidence based on the alleged undue suggestiveness would not have been successful, even if the identification here could be said to have been the product of a showup. Thus, defense counsel's performance was not deficient, nor was defendant prejudiced. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674, 696]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)

## II. Custody and Conduct Credits

Defendant asserts that the trial court miscalculated the number of days he was to be credited for actual custody and conduct credits. Specifically, defendant asserts that the trial court failed to include the 11 days he was initially jailed in this matter, from April 6, 2013, through April 16, 2013, before he was released on bail. The People agree, and

---

[7] The police reports which counsel may have relied upon, but which are not before this court and which defendant does not mention on appeal, may have also showed the circumstances of the identifications. This possibility alone would warrant our rejection of defendant's claim of ineffective assistance of counsel on appeal. "[C]ounsel's decisionmaking must be evaluated in the context of *the available facts*. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People v. Maury* (2003) 30 Cal.4th 342, 389, italics added.) A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

16

concede that defendant should be credited an additional 11 days in actual custody credit and 11 days in conduct credit. We agree as well.

As a general rule, "[i]f there are no other issues, the filing of a motion in the trial court is a prerequisite to raising a presentence credit issue on appeal." (*People v. Acosta* (1996) 48 Cal.App.4th 411, 427-428, fn. omitted.) However, where an appeal addresses issues other than a challenge to the trial court's custody credit calculation, the calculation may properly be raised on appeal. (*People v. Florez* (2005) 132 Cal.App.4th 314, 318, fn. 12; *People v. Jones* (2000) 82 Cal.App.4th 485, 493.)

"A defendant is entitled to actual custody credit for 'all days of custody' in county jail." (*People v. Denman* (2013) 218 Cal.App.4th 800, 814, quoting § 2900.5, subd. (a), and citing *People v. Smith* (1989) 211 Cal.App.3d 523, 526.) "Conduct credits shall be computed on the full period of custody commencing with the day of arrest. [Citation.] Therefore, a sentencing court must award credits for all days in custody up to and including the day of sentencing." (*People v. Bravo* (1990) 219 Cal.App.3d 729, 735.) "It is presumed the Legislature intended to treat any partial day as a whole day." (*Ibid*.)

Here, defendant was arrested on April 6, 2013. He was released on bail on April 16, 2013. These 11 days in custody, including the day on which defendant was arrested, are not reflected in the number of days credited to defendant for actual custody and conduct credit. Rather, the trial court credited defendant with 99 days in each of those categories for a total of 198 days, based on the period between March 2, 2015, when defendant was found guilty and remanded to custody, and June 8, 2015, when defendant was sentenced. Taking into consideration the 11 days defendant was in custody from April 6, 2013, through April 16, 2013, defendant is entitled to 110 days actual credit and 110 days conduct credit for a total of 220 days. The relevant minute order and the abstract of judgment must be amended accordingly.

17

### III.    Statutory Basis for Surcharge

Defendant asserts that the abstract of judgment and the sentencing minute order must be amended to reflect the statutory basis for the 10 percent surcharge imposed on his $300 restitution fine.  The People concede and we agree.

This court has previously held that trial courts have a duty to recite all fees and fines, including their statutory bases, on the record at sentencing.  (*People v. High* (2004) 119 Cal.App.4th 1192, 1200-1201.)  At sentencing, the trial court stated:  "There is a $300 restitution fine with a ten percent surcharge . . . ."  The abstract of judgment states, on line eight,  "$30 SURCHARGE," without any further specificity.  The minute order at sentencing on June 8, 2015, is more specific.  After imposition of the $300 restitution fine, the minute order states:  "PLUS $30.00 ADMINISTRATIVE SURCHARGE FOR RESTITUTION FINE - RESTITUTION FUND COLLECTION FEE."

As suggested by the People, the fee imposed, and the reference in the minute order, almost certainly refer to the fee authorized by section 1202.4, subdivision (*l*).[8] Defendant does not dispute this in his reply brief.

This court has previously held that this surcharge was properly imposed to reimburse the county for the administrative cost of collecting the restitution fine in a case where the defendant was sentenced to prison (*People v. Robertson* (2009) 174 Cal.App.4th 206, 211), and defendant does not challenge the imposition of the surcharge here on the ground that he was sent to prison.  The abstract and minute order must be corrected to include the statutory basis for the administrative surcharge.

---

[8]  Section 1202.4, subdivision (*l*), provides:  "At its discretion, the board of supervisors of a county may impose a fee to cover the actual administrative cost of collecting the restitution fine, not to exceed 10 percent of the amount ordered to be paid, to be added to the restitution fine and included in the order of the court, the proceeds of which shall be deposited in the general fund of the county."

## DISPOSITION

The trial court is ordered to correct the minute order dated June 8, 2015, and the abstract of judgment to (1) credit defendant with 110 days actual custody time and 110 days conduct credits for a total of 220 days presentence custody credits, and (2) state that the statutory basis for the $30 administrative surcharge is section 1202.4, subdivision (*l*). The trial court is further ordered to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

                                                     MURRAY        , J.

We concur:


       BLEASE         , Acting P. J.


       HULL           , J.